**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| GREGORY S. MILLIGAN, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR GLOBAL CREDIT RECOVERY, LLC, ET AL., | * | |
| Plaintiff, | * | |
| v. | * | Civil No. 23-2691-BAH |
| JOHN JEFFREY MAY ET AL., | * | |
| Defendants. | * | |

* * * * * * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Receiver Gregory S. Milligan ("the Receiver" or "Plaintiff") brought a "clawback" action against fifty-seven individuals and entities (collectively "Defendants") seeking recovery of "net winnings" or "fictitious profits" Defendants allegedly received as a result of their investment in a multimillion-dollar Ponzi scheme. ECF 1. A more fulsome procedural and factual history can be found in the Court's prior opinions. *See* ECFs 140 and 172. The Court repeats here only what is necessary to contextualize the motions considered herein. Defendant Frank Savarese (and FA Investments, LLC) answered the complaint, ECF 33, as did Defendant Cyrus Irani, ECF 168.

Other defendants filed motions to dismiss, which the Court denied. *See* ECF 140 (memorandum opinion denying motions to dismiss filed by Defendants Logic Growth, LLC, John Jeffrey May, Jahed A. Hamrah, Belquis Sadozai, Zarghoona Sadozai, Double H International Holdings, Inc., Richard Hall, Barry G. Morse, Lana Wahl, Vicky Wahl, George Wahl III, Aubrey Carter, and Courtney Nowell); ECF 141 (implementing order); ECF 172 (memorandum opinion,

inter alia, denying Defendant Gary Day's motion to dismiss); ECF 173 (implementing order). The Court also granted the Receiver's motions to dismiss counterclaims brought by some defendants. *See* ECF 172 (memorandum opinion); ECF 173 (implementing order).

In January and February 2026, before the close of discovery, Defendants Irani and Savarese filed motions for summary judgment.[1] *See* ECF 194 (Irani's motion filed January 2, 2026); ECF 202 (Savarese's motion filed February 10, 2026). The motions are ripe for this Court's review.[2] *See* ECF 195 (Plaintiff's opposition to Irani's motion); ECF 199 (Irani's reply); ECF 208 (Plaintiff's opposition to Savarese's motion); ECF 213 (Savarese's reply). The motions include memoranda of law and exhibits, as do Plaintiff's oppositions.[3]

Also pending are a number of motions for summary judgment (and accompanying motions to seal) filed later. *See* ECF 216 (Morse's motion); ECF 218 (Receiver's motion against Morse); ECF 219 (Day's motion); ECF 225 (Receiver's motion against remaining defendants); ECF 228 (Receiver's motion against Day); ECF 279 (Carter and Nowell's motion); ECFs 219, 224, 226,

[1] At the time Irani filed his motion, discovery was set to close about a month later on January 29, 2026, and the dispositive motions deadline was March 2, 2026. *See* ECF 177. Upon joint motion of the parties, the Court extended these deadlines to March 21 and May 11, respectively. *See* ECF 197 (motion); ECF 198 (order granting motion). Thus, at the time Savarese filed his motion, there was still over a month of discovery remaining and dispositive motions were not due for about another three months.

[2] Also pending are two motions to seal exhibits filed by Savarese and Plaintiff pursuant to the stipulated protective order entered by the Court (ECF 191). *See* ECF 203 (Savarese's motion to seal Exhibit 3 to his motion); ECF 209 (Plaintiff's motion to seal Exhibits 1-A and 1-B to his opposition). These motions are unopposed and will be granted for the reasons stated in the motions. The Court will cite to these materials where appropriate but will endeavor to do so without specificity. *See* ECF 204 (sealed Exhibit 3 to Savarese's motion); ECF 210 (sealed Exhibit 1-A to Plaintiff's opposition); ECF 211 (sealed Exhibit 1-B to Plaintiff's opposition).

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page. Unless otherwise noted, citations to ECF numbers refer to documents in the above-captioned case.

229, 247, 256, 261, 272, 282, 296, 297, 298, 299, and 300 (motions to seal). The Court does not resolve any of these later filed motions, except Carter and Nowell's motion for summary judgment, which will be denied as moot due to their settlement. *See* ECF 290. The Court need not resolve the Receiver's motion against Irani and Savarese yet because "the court must review each motion [for summary judgment] separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). The Court looks to the motion and papers relevant to the Receiver's motion at times, however, where the arguments therein provide additional context relevant to the motions currently before the Court. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Irani's motion and Savarese's motion are both DENIED.

## I. <u>BACKGROUND COMMON TO BOTH MOTIONS</u>

In 2019, Kevin Merrill and Jay Ledford, along with Cameron Jezierski, pled guilty in this Court to several charges related to their operation of a Ponzi scheme. *See United States v. Kevin B. Merrill et al.*, Crim. No. RDB-18-465 (D. Md. filed Sept. 11, 2018) (hereinafter the "Criminal Action"), ECF 81 (Merrill's plea agreement to conspiracy to commit wire fraud and wire fraud in violation of 18 U.S.C. §§ 1349 and 1343); Criminal Action, ECF 87 (Ledford's plea agreement to conspiracy to commit wire fraud, aggravated identity theft, and money laundering in excess of $10,000 in violation of 18 U.S.C. § 1349, 1028A and 1957); Criminal Action, ECF 76 (Jezierski's plea agreement to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349). As part of their plea agreements, Merrill and Ledford admitted to operating a Ponzi scheme along with Jezierski through various entities, including Delmarva Capital, DeVille Asset Management, Global Credit Recovery, Rhino Capital Holdings, Rhino Capital Group, and Riverwalk Financial Corporation, from 2013 until 2018 when the scheme collapsed. *See* Criminal Action, ECF 81-1

and ECF 87-1. Both agreed that "[f]rom 2013 – 2018, the scheme to defraud took in over $394 million and returned approximately $248 million to investors." Criminal Action, ECF 81-1, at 15; Criminal Action, ECF 87-1, at 12.

On September 13, 2018, the Securities and Exchange Commission ("SEC") brought an enforcement action against Merrill, Ledford, Jezierski, and the entities through which they had perpetrated the Ponzi scheme.[4] *See SEC v. Merrill et al.*, Civ. No. RDB-18-2844 (D. Md. filed Sept. 13, 2018) (hereinafter the "Enforcement Action"), ECF 1. The Court appointed Gregory Milligan as Receiver. *See* Enforcement Action, ECFs 11, 62, 484, and 769 (receivership orders); *see also* ECF 195-1, at 1 ¶ 3. As part of that appointment, Milligan was tasked with the following:

> To investigate, compromise, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against any non-individual Receivership Party or the Receivership Estate in any state, federal or foreign court or proceeding of any kind as may in the Receiver's discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

Enforcement Action, ECF 769, at 7 ¶ 8.I. "As part of [his] investigation in the SEC [Enforcement] Action, [the Receiver] obtained copies of the Receivership Parties' bank records, business records, emails, text messages, and other relevant documents and information." ECF 195-2, at 2 ¶ 5; ECF 208-2, at 3 ¶ 5. This includes Delmarva Capital's bank statements, *see* ECF 195-3 and ECF 210 (under seal), Delmarva Capital's wire transfer records, *see* ECF 195-4 and ECF 211 (under seal), and text messages, including those between Merrill and an individual named Ravi Iyer, *see* ECF 195-5. Milligan provides in his declarations that "[a]fter [his] investigation and review of all the documents," he

> determined that Defendant Cyrus Irani and his business entities, Cyman Entertainment, Inc. and Barn Wood Innovations, LLC, were investors in the Ponzi

[4] The SEC filed an amended complaint on November 6, 2018. *CCWB Asset Invs., LLC v. Milligan*, 112 F.4th 171, 175 (4th Cir. 2024).

> scheme who received fictitious profits. Irani invested his funds with Kevin Merrill through a third-party intermediary, Ravi Iyer, and acting on Irani's behalf, Iyer requested transfers from Merrill to accounts belonging to Irani.

ECF 195-2, at 2 ¶ 9. Milligan further "determined that Defendant Frank Savarese and his forfeited LLC [limited liability company], FA Investments, received fictitious profits from the Ponzi scheme." ECF 208-2, at 3 ¶ 8. The Receiver brought claims for fraudulent transfer and, alternatively, for unjust enrichment against alleged net winners of the Ponzi scheme, including Irani and Savarese. *See* ECF 1, at 9–11.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 372 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

"Where, as here, the nonmoving party bears the ultimate burden of proof at trial, the moving party may discharge its initial burden at summary judgment by 'showing—that is, pointing out to the . . . court—that there is an absence of evidence to support the nonmoving party's case." *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "If the moving party carries this initial burden, the burden then shifts to the nonmoving party, who must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court "may not make credibility determinations or weigh the evidence." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins.*

*Co.*, 608 F. Supp. 3d at 372 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III. IRANI'S MOTION

### A. Parties' Positions

In his motion, Irani's entire argument in favor of summary judgment is that both the fraudulent transfer and unjust enrichment claims fail as a matter of law because, he contends, there is no evidence he made any investment with any Receivership Party and therefore cannot be a "net winner" as defined in the complaint. *See* ECF 194-1, at 4–6. He cites no authority in support. Instead, Irani asserts that he ran an illegal sports gambling operation coinciding with the time the Ponzi scheme operated. *See* ECF 194-1, at 5. He ran the operation between January 3, 2013, and September 8, 2015, pled guilty in August 2017, and served a year of incarceration from October 2017 to September 2018. *See* ECF 194-4 (Irani declaration), at 1 ¶¶ 3–4; ECF 194-2 (plea agreement); ECF 194-3 (press release regarding Irani's indictment). His assets, as well as the assets of Cyman Entertainment—his business (of which he is the sole president and officer) and co-defendant in this action—were seized by federal authorities in October 2015. *See* ECF 194-4, at 2 ¶ 5. Irani declares under penalty of perjury that "[u]ntil [he] was served with the Complaint in this case, [he] had never heard of Kevin Merrill, Jay Ledford, or any of the 'Receivership Parties' listed in the Complaint," that he was "unaware of the Ponzi scheme alleged in the Complaint," and that neither he nor Cyman Entertainment "[]ever made any investment with any Receivership Party." *Id.* ¶¶ 6–7. He also contends that he has no knowledge or association with an entity called Barn Wood Innovations, LLC ("Barn Wood"). *Id.* ¶ 8.

The Receiver opposes, pointing to text messages between Kevin Merrill and Ravi Iyer, a third party "who acted as an intermediary between the Receivership Parties and several investors,

including Irani." ECF 195-1, at 3; *see also* ECF 195-2 (declaration of Receiver Gregory Milligan), at 2 ¶ 9; ECF 195-5 (text messages). The Receiver summarizes the payments at issue as follows:

> Delmarva Capital's bank statements demonstrate that Irani made a $38,000 deposit on September 23, 2015 [ECF 195-3, at 22], for which the Receiver has provided a credit, and that the following payments were made to Defendant Cyrus Irani directly, or by and through Cyman or Barn Wood:
>
> - August 7, 2014: $9,000 to a Citibank account belonging to Irani [ECF 195-3, at 2; ECF 195-4, at 2];
> - September 18, 2014: $9,000 to a Citibank account belonging to Irani [ECF 195-3, at 7; ECF 195-4, at 4];
> - January 21, 2015: $17,000 to a Citibank account belonging to Irani [ECF 195-3, at 11; ECF 195-4, at 5–6];
> - January 21, 2015: $16,000 to a Citibank account belonging to Irani [ECF 195-3, at 11; ECF 195-4, at 6];
> - May 4, 2015: $16,000 to a Citibank account belonging to Irani [ECF 195-3, at 15; ECF 195-4, at 7];
> - May 4, 2015: $13,000 to a Citibank account belonging to Irani [ECF 195-3, at 15; ECF 195-4, at 8–9];
> - June 23, 2015: $100,000 to a Citibank account belonging to Cyman Entertainment [ECF 195-3, at 19; ECF 195-4, at 10];
> - October 16, 2015: $2,500 to Cyman Entertainment [ECF 195-3, at 28; ECF 195-4, at 11];
> - May 31, 2016: $44,250 to Barn Wood Innovations [ECF 195-3, at 33; ECF 195-4, at 12];
> - July 20, 2016: $57,500 to Barn Wood Innovations [ECF 195-3, at 37; ECF 195-4, at 14]; and
> - August 9, 2016: $70,000 to Barn Wood Innovations [ECF 195-3, at 40; ECF 195-4, at 15–16].

ECF 195-1, at 4.

Upon being presented with Delmarva Capital's bank statements, the wire transfer confirmations, and the text messages, Irani refines his arguments in reply. *See* ECF 199. He argues that "[t]he Receiver's Opposition contains zero admissible evidence creating a material dispute of fact to defeat summary judgment." *See id.* at 1. He maintains that he never invested with any Receivership Party so, under the complaint's definition of a "net winner," he cannot be one. *Id.* at 5–8. He also contends that Milligan has not provided competent and admissible

evidence tying him to Barn Wood. *See id.* at 2–5. In support, he provides a copy of Barn Wood's registration information with the state of North Carolina, reflecting that Barn Wood is a dissolved LLC with its addresses in North Carolina and with an individual named Brett W. Adams listed as the LLC's Chief Executive Officer. ECF 199-1. He further argues that even if the Court could consider the text messages (which he contends are inadmissible hearsay), they "undermine the idea that Barn Wood payments were made to Irani" because the text messages reference payments that do not match the amounts or dates of payments to the Barn Wood account and because the text messages indicate payments sent to this account were also sent for the benefit of another defendant. ECF 199, at 4–5 & n.3.

**B. Analysis**

While Irani perhaps makes some strong arguments as to the eventual question of his liability, he has not demonstrated that there is no genuine dispute of material fact such that he is entitled to judgment as a matter of law. To the extent Irani's argument hinges on the complaint's definition of a "net winner" and his purported lack of investment, this contention goes to the central factual issue in dispute. "[T]he sufficiency of the allegations of a complaint do not determine the motion for summary judgment, for if this were the case, Rule 56 would be a nullity for it would merely duplicate the motion to dismiss." *Seago v. N.C. Theatres, Inc.*, 42 F.R.D. 627, 635 (E.D.N.C. 1966) (citing *Lindsey v. Leavy*, 149 F.2d 899 (9th Cir. 1945)), *aff'd*, 388 F.2d 987 (4th Cir. 1967). More importantly at this stage, the Receiver has provided evidence from which a reasonable jury could conclude that Irani did indeed invest in the Ponzi scheme.

"The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). That is not the case here, where the Receiver has provided more than a mere "scintilla," even if not by much. *See id.* at 761 n.3 (discussing the difficulty in

applying the "scintilla" of evidence standard and advising courts to "actively engage with the requirements to provide 'specific, material facts' about 'genuine issues' and to avoid 'conclusory allegations and denials' in analyzing the arguments of the parties"). True, the bank records of the alleged $38,000 investment do not include any detail more than the fact that it was a "deposit made in a branch/store." ECF 195-3, at 22 (capitalization altered). At the same time, however, setting aside the separate questions related to Barn Wood, bank and wire records reflect that Delmarva Capital, a Receivership Entity, paid $80,000 to an account belonging to Irani and $102,500 to an account owned by Irani's inactive business (for which he was the sole president and officer), Cyman Entertainment. A reasonable jury could conclude that the payments Irani and Cyman Entertainment were made pursuant to the Ponzi scheme. *See Ashmore for Wilson v. Dodds*, 262 F. Supp. 3d 341, 357 (D.S.C. 2017) (denying summary judgment on alleged net winner's equitable setoff claim and finding an account statement reflecting payment "sufficient evidence to raise a genuine dispute of fact as to whether Defendant received the payment"); *SEC v. Melton*, No. 1:23-CV-434, 2025 WL 1135180, at *5 (M.D.N.C. Apr. 17, 2025) ("[P]arties are not required to present direct evidence to obtain [or avoid] summary judgment; 'circumstantial evidence is treated no differently than direct evidence.'" (quoting *Sedar*, 988 F.3d at 764)). Irani's "argument might be sound reason for denying the Receiver's motion for summary judgment on portions of his claims, but it offers no reason to grant summary judgment to Defendant [Irani]." *Ashmore*, 262 F. Supp. 3d at 355.

Turning to the Barn Wood payments, Irani contends that the text messages are inadmissible hearsay, so they must be excluded and cannot generate a dispute of material fact. *See* ECF 199, at 3–4. "In supporting or opposing summary judgment, a party must rely on facts that would be admissible at trial." *Rybas v. Riverview Hotel Corp.*, 21 F. Supp. 3d 548, 559 (D. Md. 2014).

However, the Supreme Court affirmed in *Celotex Corp.* that this "do[es] not mean that the nonmoving party must produce evidence *in a form that would be admissible at trial* in order to avoid summary judgment." 477 U.S. at 324 (emphasis added). "Obviously," the Supreme Court noted, "Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.*

The text messages contain exchanges between "KBM" and "Ravi," *see generally* ECF 195-5, exchanges the Receiver represents as "true and correct cop[ies] . . . of the text messages between Ravi Iyer and Kevin Merrill," ECF 195-2, at 2 ¶ 8. The Receiver obtained these records "[a]s part of [his] investigation in the SEC [Enforcement] Action," *id.* ¶ 5, but the precise manner in which he obtained them or determined the identities of the parties to the exchange is unclear from the current record. On June 23, 2015, the following text exchange occurs[5]:

> KBM: Just sent both 100k wires to our friend
> Ravi: good – 100 to cyman and 100 to kash?
> Ravi: i'll tell aman
> KBM: Correct

ECF 195-5, at 1–2. Bank and wire records indicate that Delmarva Capital wired $100,000 to Cyman Entertainment on June 23, 2015. *See* ECF 195-3, at 19; ECF 195-4, at 10. On October 15, 2015, Ravi sends "Cyrus wire for $2,500." ECF 195-5, at 4–5. On November 2, 2015, KBM asks "What about Cyrus – did I pay either of these yet[?]" *Id.* at 7. Ravi responds: "you paid $2,500 to Cyrus – that's why [I] said you only owe him $6,500 on one of the wires." *Id.* Bank

[5] There are typographical errors in the text messages the Court largely leaves unaltered.

and wire records indicate that Delmarva Capital wired $2,500 to Cyman Entertainment on October 16, 2015.[6] *See* ECF 195-3, at 28; ECF 195-4, at 11.

On May 21, 2016, Ravi writes: "Also, another reminder that on July, August, September 15 Cyrus will be pulling his $50k investments to handle legal bills." ECF 195-5, at 10. There do not appear to be corroborating bank or wire records as to these payments. On July 14, 2016, the following exchange occurs:

> Ravi: Have to do Monday at latest. Cyrus wire for $57,500 scheduled for tomorrow but obviously can wait til Monday
> . . .
> KBM: I can do it.
> KBM: Where does it go
> . . .
> Ravi: I will send you the wire instructions over text
> KBM: Is it the same?
> Ravi: It's the Barnwood account. The one you just used for Aman. I will send to you in picture now
> Ravi: $57,500 to that account
> KBM: Ok
> Ravi: Thanks. . . .

*Id.* at 12–13. The following day, Ravi texts in relevant part: "[D]id Cyrus wire go out?" *Id.* at 13. On July 20, 2016, Ravi follows up:

> Ravi: Hey did you send the $57,500 wire to Barnwood (Cyrus) on the 15th?
> KBM: I put it in yes
> Ravi: Ok. Aman said he didn't see it. I'll confirm with him. Thanks
> KBM: I'll double check when I get in
> Ravi: Ok, thanks

*Id.* at 15. Bank and wire records indicate a payment of $57,500 was made to Barn Wood on July 20, 2016. ECF 195-3, at 37; ECF 195-4, at 14. There are no text messages in the record before the Court discussing the May 31, 2016, $44,250 payment and August 9, 2016, $70,000 payment made to Barn Wood.

[6] The Receiver does not point to any $6,500 payment in the bank or wire records.

As Irani's hearsay argument was made in the reply to his motion, the Receiver did not have an opportunity for rebuttal in the normal course of motions practice.[7] The Receiver did not seek leave to file a surreply. In the Receiver's later filed reply in support of his own motion for summary judgment (which, again, the Court does not decide here), the Receiver contends that the text messages are "admissible" and "competent."[8] *See* ECF 294, at 2–3. While the argument could have benefitted from further development, the Court understands the Receiver to argue that the text messages are not hearsay because they are not offered for the truth of the matter asserted therein, i.e., that certain specific payments to Barn Wood were actually made on Irani's behalf. Rather, in a more general sense, "[t]hese text messages indicate that Iyer handled investments on Irani's behalf." ECF 294, at 3. The Court is not necessarily persuaded, as this appears to be a distinction without a difference, but leaves the ultimate resolution of this question for another day. For now, without more from either party,[9] the Court can easily fathom at least one way in which

[7] The Court notes that Irani's central argument appears to have shifted from his initial motion to his reply. Irani's initial motion—made prior to the conclusion of discovery—was premised on his sworn statement that "[u]ntil [he] was served with the Complaint in this case, [he] had never heard of Kevin Merrill, Jay Ledford, or any of the 'Receivership Parties[.]'" ECF 194-4, at 2 ¶ 6. Nor had "[he] made any investment with any Receivership Party. As the sole president and officer of Cyman Entertainment, [he] know[s] that Cyman Entertainment also never made any investment with any Receivership Paty." *Id.* ¶ 7. Faced with evidence seeming to indicate that accounts belonging to Irani and Cyman Entertainment received thousands of dollars in wire transfers directly from Delmarva Capital, a Receivership Party, Irani apparently abandons in reply his sworn contention that he had never even heard of any Receivership Party. *See* ECF 199, at 2–5 (focusing reply on ties between Irani and Barn Wood payments); *id.* at 5–8 (challenging Receiver's contention that he invested with Delmarva Capital but omitting any reference to bank and wire records indicating direct payments to Irani and Cyman Entertainment).

[8] The Receiver did not address the admissibility of the text messages in his own motion, despite relying on them. *See generally* ECF 225. In his opposition to the Receiver's summary judgment motion, Irani does not make the same hearsay argument, but he "adopts and incorporates" the arguments made in his motion for summary judgment. ECF 253, at 2 n.1.

[9] In support of his hearsay argument, Irani cites a single unpublished case declining to consider emails on summary judgment as inadmissible hearsay. *See* ECF 199, at 3 (citing and quoting *It's*

the key information contained in the text messages—that Ravi Iyer managed Irani's investments in the Ponzi scheme and that certain payments Delmarva Capital paid to Barn Wood were made for Irani's benefit—may come out at trial: through the testimony of a declarant. *See U.S. Dep't of Hous. & Urb. Dev. v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc.*, 64 F.3d 920, 926 (4th Cir. 1995) (noting that "the nonmoving party could defeat summary judgment with materials capable of being reduced to admissible evidence at trial"); *Celotex Corp.*, 477 U.S. at 324.[10]

Irani may be correct that the evidence the Receiver has attached to his opposition "explain[s] nothing about what Barn Wood is or how it relates to Irani, nor do the text messages prove that a Barn Wood account 'belong[ed]' to Irani or that Barn Wood is Irani's 'business entity.'" ECF 199, at 4 (citation omitted). But a reasonable jury could review the text messages (or the testimony of a declarant testifying to the same effect) and conclude that Irani invested in the Ponzi scheme through Iyer and that payments Iyer coordinated with Merrill were made to Barn Wood for Irani's benefit, regardless of the ownership or registration information of that entity.[11]

---

*My Party, Inc. v. Live Nation, Inc.*, Civ. No. JFM-09-547, 2012 WL 3655470 (D. Md. Aug. 23, 2012)). This case does not contain any discussion of the rule that hearsay may be considered on summary judgment if the information contained therein could be reduced to admissible form at trial.

[10] The Court expects that these text messages will no doubt be the subject of a motion in limine should this case proceed to trial against Irani. The Court may revisit summary judgment on this point, if appropriate, after any ruling on such a motion, *see* Fed. R. Civ. P. 54(b); *Clear Touch Interactive, Inc. v. Ockers Co.*, 171 F.4th 715, 729 (4th Cir. 2026) (finding district court permissibly reconsidered summary judgment on eve of trial where "substantially different evidence [had] emerged"), or on a motion for judgment as a matter of law made under Rule 50.

[11] Indeed, viewing the record in the light most favorable to the Receiver, Irani himself has provided evidence from which a jury could infer the reason why, after October 2015, Delmarva Capital no longer made payments directly to Irani or Cyman Entertainment and instead made such payments to a different account (Barn Wood). Those accounts were seized by federal authorities at that time.

The Receiver has produced enough evidence to satisfy the Court that there is a genuine dispute of material fact as to Irani's receipt of funds from Delmarva Capital, a Receivership Party, whether that be directly to him or through Cyman Entertainment and/or Barn Wood such that Irani is not entitled to judgment as a matter of law. Irani's motion is denied.

## IV. SAVARESE'S MOTION

### A. Parties' Positions

Savarese argues that he is entitled to summary judgment in his individual capacity on both the fraudulent transfer and unjust enrichment claims because payments from Delmarva Capital were made to FA Investments, "a now-forfeited LLC of which Mr. Savarese is a member." ECF 202-1, at 1–2. He therefore "cannot be a 'net winner' because he never received payments from (or invested with) any Receivership Party." *Id.* at 5. Savarese explains that FA Investments was formed on October 28, 2005, "in part to be a source of loans to Delmarva Capital[.]" ECF 202-5 (Savarese declaration), at 1 ¶¶ 2–3. Prior to the Ponzi scheme, "FA Investments loaned several hundreds of thousands of dollars to Delmarva. Over the next several years, Delmarva made repayments on those loans, including to principal and interest." *Id.* ¶ 4. "FA Investments was forfeited on or around October 1, 2010." *Id.* at 2 ¶ 6. Savarese contends that the payments Delmarva Capital made to FA Investments during the time of the Ponzi scheme's operation (2013–2018) were repayments on "loans provided from FA Investments to Delmarva [] before the Ponzi scheme allegedly began." *Id.* ¶ 7. Savarese attaches emails between himself and Kevin Merrill dated January 2013. ECF 202-3. In those emails, Savarese, who contends he was acting on behalf of FA Investments,[12] emailed Merrill "looking for the quarterly wire on the $250,000." *Id.* at 3; ECF 202-5, at 1–2 ¶ 5. Merrill confirmed it would be sent by that Friday (January 11, 2013), and

[12] Savarese sent these emails from his law firm email. *See* ECF 202-3. The emails do not refer to FA Investments. *See id.*

Savarese confirmed receipt. ECF 202-3, at 2–3. Bank and wire records provided by the Receiver reflect that Delmarva Capital wired $9,400 with the beneficiary listed as "Fa Investments" on January 11, 2013. ECF 210, at 6; ECF 211, at 3. Savarese further contests that the payments are traceable to him personally. *See* ECF 202-1, at 6–7.

The Receiver opposes, arguing that Maryland law permits individual liability against LLC members for conduct and liabilities incurred after the LLC's forfeiture. *See* ECF 208-1, at 4–6. He attaches excerpts of bank and wire records indicating the following payments were made from Delmarva Capital to FA Investments:

- A 1/11/2013 wire transfer in the amount of $9,400.00, ECF 210, at 6; ECF 211, at 3;
- A 5/2/2016 wire transfer in the amount of $150,000.00, ECF 210, at 9; ECF 211, at 4;
- A 5/2/2016 wire transfer in the amount of $8,900.00, ECF 210, at 9;
- A 5/2/2016 wire transfer in the amount of $6,700.00, *id.*;
- A 1/31/2018 Wire Transfer (105,998.00), *id.* at 14; ECF 211, at 5.

The Receiver's First Amended Objections and Responses to Savarese Defendants' First Set of Discovery Requests, attached to Savarese's motion, indicate the Receiver also seeks to recover over $400,000 based on several dozen additional payments made to FA Investments during the time the Ponzi scheme operated. *See* ECF 202-2, at 9–10. The Receiver argues that his "theory of recovery stems from the Receiver's asset tracing duties under the Receivership Order," and that "[a]sset tracing is standard practice in fraudulent transfer litigation" such as this. *Id.* at 8–9. He also contends that Savarese's focus on "his position as a subsequent transferee and [his claim] that he never received payments in his individual capacity" is immaterial because "[h]e does not dispute that FA Investments received payments from Delmarva Capital, nor does he dispute that FA Investments forfeited its LLC status well before those payments were made." *Id.* at 10. "Whether Savarese received funds directly from Delmarva Capital or indirectly through FA Investments, the

result is the same—he is personally liable for any fraudulent transfers received." *Id.* at 11. Finally, the Receiver argues that:

> Should the Court nonetheless find that Savarese adequately identified an absence of evidence in the record, the undisputed evidence supports the existence of payments made to FA Investments for which Savarese is personally liable. He is liable as a person who received funds traceable to the Receivership Estate, or as the lone member transacting business for the account of a long-forfeited LLC.

*Id.* at 12.

In reply, Savarese maintains that he remains protected from personal liability as a member of the LLC, that the Receiver's "asset tracing" theory is not permissible, and, in any case, that the Receiver has not brought forth evidence supporting this theory. *See* ECF 213, at 3–7.

**B. Analysis**

Much of the parties' arguments focus on whether Maryland law permits personal liability for actions taken on behalf of a forfeited LLC. LLCs "are separate and distinct legal entities and offer protection against personal liability." *MT Holding Corp. I v. PNC Bank*, No. 377, Sept. Term 2015, 2018 WL 3993732, at *7 (Md. App. Aug. 20, 2018) (citing *Robinson v. Glynn*, 349 F.3d 166, 174 (4th Cir. 2003)). "A member of an LLC generally is not liable for torts committed by, or contractual obligations acquired by, the LLC." *Allen v. Dackman*, 991 A.2d 1216, 1228 (Md. 2010) (citing, e.g., Md. Code Ann., Corps. & Ass'ns ("CA") § 4A-301). But this protection from liability is not absolute. For example, even when an individual is a member of an active LLC in good standing, "[a]n individual may be liable . . . 'for torts [he or she] personally commit[s], or which [he or she] inspire[s] or participate[s] in, even though performed in the name of an artificial body,' . . . [or] when he or she 'is present on a daily basis during commission of the tort and gives direct orders that cause commission of the tort.'" *Id.* (first quoting *Metromedia v. WCBM*

*Maryland*, 610 A.2d 791, 794–95 (Md. 1992), then quoting *MaryCLE v. First Choice*, 890 A.2d 818, 845 (Md. App. 2006)).

"[U]pon an LLC's failure to pay tax, unemployment insurance contribution, or file an annual report, 'the right to do business in Maryland and the right to the use of the name for each limited liability company is forfeited.'" *MT Holding Corp. I*, 2018 WL 3993732, at *7 (citing Md. Code Ann., CA § 4A-911). If an LLC timely cures the deficiencies that led to forfeiture, "its right to do business and to use its name in Maryland is retroactively restored as of the date of forfeiture." *7222 Ambassador Rd., LLC v. Nat'l Ctr. on Institutions & Alternatives, Inc.*, 233 A.3d 124, 127 (Md. 2020) (citing Md. Code Ann., CA § 4A-912). "[F]orfeiture of the right to do business does not render an LLC a complete non-entity. In particular, with specific reference to litigation, the savings provision in the LLC Act allows an LLC that has forfeited its right to do business to 'defend any action, suit, or proceeding in a court of this State.'" *Id.* at 130 (quoting Md. Code Ann., CA § 4A-920).

Savarese points to the LLC Act's savings provision to dispute the contention that he may be personally liable for payments made to the forfeited FA Investments. *See* ECF 213, at 3. Savarese overreads its protection for a forfeited LLC's members. The savings provision provides:

> The forfeiture of the right to do business in Maryland and the right to the use of the name of the limited liability company under this title does not impair the validity of a contract or act of the limited liability company entered into or done either before or after the forfeiture, or prevent the limited liability company from defending any action, suit, or proceeding in a court of this State.

Md. Code Ann., CA § 4A-920. Importantly,

> The savings provision does not exist simply to give back what the forfeiture provision takes away. Rather, it provides some protection for those with whom the LLC does business. By upholding the validity of the LLC's contractual obligations and allowing it to defend litigation initiated by others, *the savings provision prevents the forfeiture from being used to the detriment of third parties*. Thus, an

> LLC cannot avoid fulfilling its contracts or deprive someone else of a judicial remedy against the LLC simply by succumbing to forfeiture.

*7222 Ambassador Rd.*, 233 A.3d at 130 (emphasis added); *see also United Corrosion Control, LLC v. Carboline Co.*, No. 22-1423, 2023 WL 8712048, at *2 (4th Cir. Dec. 18, 2023) ("[T]he LLC Act ensures an LLC's forfeiture does not affect the rights of third parties.").

The Maryland Code does not endorse the continued operation of a forfeited LLC. It imposes liability on those who conduct business on behalf of or with a forfeited LLC: "Any person that transacts business in the name or for the account of a limited liability company knowing that its right to do business in Maryland has been forfeited and has not been reinstated is guilty of a misdemeanor and on conviction is subject to fine of not more than $500." *1201 W. Cross St., LLC v. Gray Ins. Grp., Inc.*, No. 2487, Sept. Term 2023, 2025 WL 2848256, at *2 (Md. App. Oct. 8, 2025) (quoting Md. Code Ann., CA § 4A-919(a)), *cert. denied,* 352 A.3d 370 (Md. 2026). And "[a] person aware of an LLC's forfeited status who nonetheless conducts business with the LLC may be prosecuted for such conduct while the LLC remains forfeited." *Id.* at *2 (citing Md. Code Ann., CA § 4A-919(b)). The Maryland Supreme Court has explained:

> [R]equiring a business entity to make a few timely filings and payments – or at least filings that are less than two months late after the entity is specially notified of its delinquency – is not an unfair price for its owners to have the shield against individual liability and the tax benefits, together with the organizational flexibility, that the LLC Act provides for a business organization. As this Court recently stated, "[t]he privileges associated with an LLC, such as tax benefits and liability protections, are afforded with the expectation that an LLC will fulfill its statutory obligations."

*7222 Ambassador Rd.*, 233 A.3d at 133 (quoting *Mayor and City Council of Baltimore v. Prime Realty Associates, LLC*, 228 A.3d 200 (Md. 2020)).

"For liability purposes, an LLC is treated like a corporation." *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 515 (D. Md. 2013) (citing *Allen*, 991 A.2d

at 1228–29). "[A] person who operates a business in the name of a corporation after the corporate charter has been forfeited, and incurs debts, is individually liable for the debts." *Bd. of Trs. of Operating Eng'rs Loc. 37 Benefit Fund v. Doracon Contracting, Inc.*, Civ. No. MJG-09-1857, 2011 WL 6736235, at *2 (D. Md. Dec. 21, 2011) (footnote omitted) (citing *In re Hare,* 205 F. Supp. 881, 883 (D. Md. 1962); *Moore v. Occupational Safety & Health Review Comm'n,* 591 F.2d 991 (4th Cir. 1979)); *see also In re Hare*, 205 F. Supp. at 884 ("[W]here by Maryland law, the forfeited corporation is deemed non-existent, and where its operations have been continued for seven and a half years without revival, in clear violation of the Maryland statute, it would be unconscionable to permit the alleged bankrupt [individuals who operated the forfeited corporation] the defense that the corporation continues to enjoy a de facto status and insulates them from personal liability[.]" (citations and footnotes omitted)); *In re Wood*, 605 B.R. 395, 399 (Bankr. D. Md. 2019) (rejecting argument that defendant could not be personally liable where "[f]or more than nine years, defendant continued to do business in the name of the Company after its charter was forfeited"). The same principles extend to LLCs. *See Etienne v. Ameri Benz Auto Serv. LLC*, Civ. No. PWG-14-2800, 2016 WL 1222569, at *2 (D. Md. Mar. 29, 2016) (denying summary judgment and rejecting argument that individual who operated forfeited LLC could not be personally liable "to the extent [the LLC] otherwise would be liable if in good standing").

Savarese cites to *Price v. Upper Chesapeake Health Ventures*, 995 A.2d 1054, 1063 (Md. App. 2010), and *Willow Grove Citizens Ass'n v. Cnty. Council of Prince George's Cnty.*, 175 A.3d 852, 856 (Md. 2017), in support of his position. *See* ECF 213, at 4. *Price* concerned whether members of an LLC could file a derivative suit against other members. 995 A.2d at 1055. The Appellate Court of Maryland held that the LLC Act's savings provision permitted that "an LLC whose rights have been forfeited for tax failures still exists as an entity, but may only defend an

action in court, not prosecute one." *Id.* at 1062. "[S]ince the LLC could not bring suit, it follows that members of the LLC could not file a derivative suit on its behalf or pursue an appeal of the dismissal of that action." *Id.* at 1063. Pursuant to *Price*, FA Investments would be permitted to defend itself in court. This case does not speak directly to a forfeited LLC's ability to collect on a loan (i.e., do business) or the liability of a member who purportedly acts on behalf of a forfeited LLC, especially years after the forfeiture.

In *Willow Grove*, the Appellate Court held that a forfeited LLC's application for a special zoning exception (made jointly with its sole member, a foreign corporation unregistered to do business in Maryland) was valid, relying on the LLC Act's savings provision. 175 A.3d at 856–57. In so holding, the Appellate Court of Maryland focuses on "the first part of § 4A-920['s] . . . broad[] affirm[ation of] the validity of 'a contract or act of the limited liability company entered into or done either before or after the forfeiture.'" *Id.* at 857. Crucially, though, the Supreme Court of Maryland subsequently has articulated a more circumspect interpretation of the savings provision. *See 7222 Ambassador Rd.*, 233 A.3d at 131 ("[V]irtually anything that an LLC does could be classified as an 'act' – which would nearly negate the forfeiture provision altogether."); *see also United Corrosion Control, LLC v. Carboline Co.*, Civ. No. GLR-19-3525, 2022 WL 861411, at *5 (D. Md. Mar. 23, 2022) (declining to rely on *Willow Grove* as incompatible with the Supreme Court of Maryland's decision in *7222 Ambassador*), *aff'd,* No. 22-1423, 2023 WL 8712048 (4th Cir. Dec. 18, 2023). Savarese does not reckon with or even cite *7222 Ambassador Rd.*

Ultimately, this question of whether Savarese can be personally liable rises and falls with the factual dispute—the purpose of the payments from Delmarva Capital to FA Investments. If they were made pursuant to a loan that predated the Ponzi scheme, as Savarese contends, then they

are not fraudulent conveyances because they would not have been made "without fair consideration." Md. Code Ann., Com. Law § 15-205. If they were made *pursuant to* the Ponzi scheme, as the Receiver contends, then Savarese's use of the forfeited LLC does not protect him from personal liability. *See In re Wood*, 605 B.R. at 399; *Etienne*, 2016 WL 1222569, at *2. This dispute of material fact precludes judgment to Savarese as a matter of law.[13] "Such an argument might be sound reason for denying the Receiver's motion for summary judgment on portions of his claims, but it offers no reason to grant summary judgment to Defendant . . . ." *Ashmore*, 262 F. Supp. 3d at 355; *see also Etienne*, 2016 WL 1222569, at *2. As such, Savarese's argument that he cannot be liable as a "net winner" because he never personally invested with a Receivership Party fails for the same reasons as Irani's analogous argument.

## V. CONCLUSION

For the foregoing reasons, Irani's and Savarese's motions for summary judgment, ECFs 194 and 202, are DENIED. The motions to seal, ECFs 203 and 209, are GRANTED. Defendants Carter and Nowell's motion for summary judgment, ECF 279, is DENIED AS MOOT. All other motions will be considered in due course. A separate implementing order will issue.

Dated: September 29, 2026

/s/
Brendan A. Hurson
United States District Judge

[13] Nor is the Court convinced that Savarese is entitled to summary judgment as a "subsequent transferee." First, the Court does not read the Receiver's theory of recovery as inconsistent with the complaint. *See* ECF 1, at 2–3, 11–12 (seeking recovery of "Net Winnings received directly *or indirectly* by the Net Winners from fictious 'profits' on their investments" (emphasis added)). Under this theory, Savarese essentially contends that even if the payments from Delmarva Capital were made to FA Investments pursuant to a Ponzi scheme, he cannot be liable for fraudulent transfer because he did not directly receive the Ponzi scheme profits from the Receivership Party. But this argument, too, rests on the factual dispute's resolution in his favor. A reasonable jury could infer from Savarese's years-long operation of the forfeited LLC and from his direct communications with Merrill coordinating the payments to the forfeited LLC that the payments were Ponzi scheme profits made for Savarese's personal benefit.